## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**MITCHELL LEE WATSON,**

      **Plaintiff,**

v.

                                     **Civil Action No. 5:10CV103**
                                     **(The Honorable Frederick P. Stamp)**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

### REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the defendant, Commissioner of

the Social Security Administration ("Defendant," and sometimes "the Commissioner"), denying

Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act.

The matter is awaiting decision on cross motions for summary judgment and has been referred to the

undersigned United States Magistrate Judge for submission of proposed findings of fact and

recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Gen. P. 86.02.

### I. PROCEDURAL HISTORY

Mitchell Lee Watson ("Plaintiff") filed an application for DIB on October 11, 2007, alleging

disability due to depression, sleep apnea, restless leg syndrome, obesity, lower back pain, hernia

complications, and breathing difficulties (R. 9, 65, 101-03). Plaintiff's applications were denied at

the initial and reconsideration levels (R. 56, 57). Plaintiff requested a hearing, which Administrative

Law Judge Timothy C. Pace ("ALJ") held on December 11, 2009 (R. 25). Plaintiff, represented by

counsel, David E. Furrer, testified on his own behalf (R. 32-51). Also testifying was Vocational

Expert James M. Ryan ("VE") (R. 51-55, 97). On January 22, 2010, the ALJ entered a decision

finding Plaintiff was not disabled and could perform a range of sedentary work (R.9-20). Plaintiff timely filed a request for review to the Appeals Council (R.100). On August 26, 2010, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R.1-5).

## II. FACTS

Plaintiff was born on May 8, 1961, and was forty-eight (48) years old at the time of the administrative hearing (R. 25,101). He had a twelfth-grade education and past relevant work as a correctional officer, laborer, machinist, and shop specialist (R. 135). Plaintiff asserted he could no longer work due to his inability to lift, bend, and stand (R. 134).

Dr. Roy Chisholm, III, M.D., noted, on March 22, 2006, that Plaintiff had undergone a "right inguinal hernia repair for a direct hernia in 2003 . . . ." Plaintiff reported he "noticed some pain and a lump in his right groin area" after lifting. Plaintiff was medicating with Lorcet. Dr. Chisholm noted Plaintiff was in no acute distress; except for a "definite hernia," his examination was normal. Plaintiff informed Dr. Chisholm that he smoked and drank occasionally. Dr. Chisholm instructed Plaintiff to not return to work, to continue medicating with Lorcet and Ibuprofen, and he would schedule him for hernia repair (R. 208).

On April 25, 2006, Dr. Chisholm found Plaintiff's post "exploration of the right inguinal area" wound was healing. Plaintiff reported his preoperative pain was gone; he had moderate postoperative pain. Dr. Chisholm prescribed Percocet and instructed Plaintiff to continue resting. Dr. Chisholm told Plaintiff "changing his work to something that d[id] not require lifting would be important as he seem[ed] to be having recurrent problems in this area with pain" (R. 209).

On May 9, 2006, Dr. Chisholm opined Plaintiff was improving, had less pain and could

2

gradually increase his activity (R. 209).

Dr. Chisholm found, on May 23, 2006, that Plaintiff was "not found to have a hernia . . . after right ilioinguinal nerve separation" (R. 209).

On June 6, 2006, Dr. Chisholm noted Plaintiff was "doing fairly well." Upon examination, there was no hernia. Dr. Chisholm released Plaintiff to return to work in one week (R. 210).

On August 4, 2006, Dr. Chisholm noted Plaintiff was doing "fairly" well. He complained of occasional right groin pain and pull and reported he did "not use any anti-inflammatories, heat or ice as he just [did] not think about it much." Dr. Chisholm's examination of Plaintiff was normal. He opined it would be "helpful to [Plaintiff] if he could pursue other work that d[id] not involve so much lifting and strenuous activity. He may pursue that at some time" (R. 210).

On August 7, 2006, Dr. Chisholm wrote a letter, addressed "To Whom It May Concern," in which he reported Plaintiff had undergone two right inguinal hernia repairs, had intermittent pain in that area, and "may be at increased risk for another hernia to develop." Dr. Chisholm wrote that he "[felt] that [Plaintiff] should pursue other work as much as he can, which would involve less lifting and less strenuous activity" (R. 211-12).

On April 13, 2007, Plaintiff informed Dr. Charles Bess that he had low back pain and spasms. Dr. Bess observed Plaintiff could maintain "relatively normal activity level with no drastic change." Plaintiff stated he had "recurrence of some inguinal pain." Plaintiff reported he drank "a lot (sic) when he" drank "(once every two weeks - couple six packs or a fifth of whiskey)" and smoked one and one-half packages of cigarettes per day. Dr. Bess noted Plaintiff was morbidly obese. He was psychologically stable; he had no changes in judgment or his reasoning abilities. Plaintiff's mood and affect were stable and congruent. Dr. Bess's examination of Plaintiff produced

normal results. He had no clubbing or edema in his extremities; he had full ranges of motion, without joint swelling or tenderness; his gait was stable and unchanged; his neurologic examination was grossly normal (R. 398). Dr. Bess noted Plaintiff had degenerative joint disease of the right shoulder, knee, ankles and hands and prescribed Nasacort, Robaxin, Anaprox, Amoxil, and Wellbutrin. Dr. Bess instructed Plaintiff to "get regular exercise," such as a "brisk walk for 20-30" minutes, and eat a low fat, low carbohydrate diet (R. 399).

Plaintiff began physical therapy at Progressive Physical Therapy & Sports Medicine Clinic on April 17, 2007, for low back pain, left sacroiliac joint ("SI joint") dysfunction. Upon examination, Eli W. Rhodes, M.P.T., found Plaintiff's trunk range of motion was normal; he could heel/toe walk without any strength deficits. Plaintiff had bilateral lumbosacral tenderness. His straight leg raising test was negative, bilaterally (R. 215). Plaintiff participated in physical therapy at Progressive Physical Therapy & Sports Medicine Clinic on April 20, 24, and 27, 2007 (R. 217-18).

On May 1, 2007, Plaintiff had physical therapy. He informed Physical Therapist Kevin Simpson that his pain had not been "quite as bad." He rated it at three (3) or four (4). Plaintiff reported he had not "been doing anything" except "keep[ing] an eye on his mother" (R. 219).

On May 2, 2007, Plaintiff informed Dr. Bess that his low back pain was "bette (sic) with PT." Plaintiff reported he drank "a lot (sic) when he" drank "(once every two weeks - couple six packs or a fifth of whiskey)." Dr. Bess noted Plaintiff was morbidly obese. He was psychologically stable; he had no changes in judgment or reasoning. Plaintiff's mood and affect were stable and congruent. Dr. Bess's examination of Plaintiff produced normal results. He had no clubbing or edema in his extremities; he had full ranges of motion, without joint swelling or tenderness; his gait was stable and unchanged; his neurologic examination was grossly normal (R. 396). Dr. Bess noted Plaintiff

had degenerative joint disease of the right shoulder, knee, ankles and hands and prescribed Nasacort, Robaxin, Anaprox, Avalox and Chantix. Dr. Bess instructed Plaintiff to "get regular exercise," such as a "brisk walk for 20-30" minutes, and eat a low fat, low carbohydrate diet (R. 397).

On May 11, 2007, Plaintiff reported to Physical Therapist Rhodes that he continued to have pain throughout his low back on the left. He rated his pain at four (4) on a scale of one-to-ten (1-10). Plaintiff reported he had "been very active since last visit. [He] ha[d] moved a refrigerator, freezer and put in a new kitchen floor in his home." He continued to care for his mother (R. 220).

On May 15, 2007, Plaintiff reported to Physical Therapist Rhodes that he "had to work on his daughter's car . . . and he kn[ew] his SI popped out . . . ." and had increased pain (R. 221).

On May 21, 2007, Plaintiff informed Physical Therapist Rhodes that he had been "feeling good for approximately 2 weeks. However, he put in a new kitchen floor in his home and ha[d] noted increased pain ever since." P.T. Rhodes found continued palpable tenderness at SI joints, bilaterally (R. 222). P.T. Rhodes opined Plaintiff's treatment should continue for four (4) weeks (R. 223).

On May 24, 2007, Physical Therapist Simpson noted Plaintiff's SI joint was "stable." Plaintiff described his pain as three (3) on a scale of one-to-ten (1-10) (R. 224).

On May 29, 2007, Plaintiff reported to Physical Therapist Simpson that he "[knew] his SI [was] out" due to his "working on 2 cars over the weekend and he state[d] his back has really been bothering him." P.T. Simpson found Plaintiff's SI joint was unstable (R. 226).

On May 29, 2007, Plaintiff informed Dr. Bess that his symptoms had "improved considerably." Plaintiff had not smoked in one (1) week. Plaintiff reported he drank "a lot (sic) when he" drank "(once every two weeks - couple six packs or a fifth of whiskey)." Plaintiff was

5

neurologically intact; he had tenderness over his acromioclavicular joint. Dr. Bess noted Plaintiff had degenerative joint disease of the right shoulder, knee, ankles and hands (R. 394). He prescribed Nasacort, Robaxin, Anaprox and Chantix. He instructed Plaintiff to "get regular exercise," such as a "brisk walk for 20-30" minutes, and eat a low fat, low carbohydrate diet (R. 395).

Plaintiff underwent physical therapy on June 1, 6, and 7, 2007. He was discharged from physical therapy on June 7, 2007, with his "long term goals unattained" (R. 229).

On July 17, 2007, Plaintiff informed Dr. Bess that his low back pain had "initially improved" after an injection, "but then worsened." Dr. Bess noted Plaintiff had not smoked for two months. Plaintiff reported he drank "a lot (sic) when he" drank "(once every two weeks - couple six packs or a fifth of whiskey)." Dr. Bess noted Plaintiff was morbidly obese. He was psychologically stable; he had no "apreciable (sic) change in judgement (sic) or reasoning ability." Plaintiff's mood and affect were stable and congruent. Dr. Bess's examination of Plaintiff produced normal results. He had no clubbing or edema in his extremities; he had full ranges of motion, without joint swelling or tenderness; his gait was stable and unchanged; his neurologic examination was grossly normal (R. 390). Dr. Bess noted Plaintiff had degenerative joint disease of the right shoulder, knee, ankles and hands. Dr. Bess prescribed Nasacort, Robaxin, Anaprox and Chantix. Dr. Bess instructed Plaintiff to "get regular exercise," such as a "brisk walk for 20-30" minutes, and eat a low fat, low carbohydrate diet (R. 391).

A MRI was conducted of Plaintiff's lumbar spine on July 25, 2007. It showed degenerative disc disease, with a mild bulging annulus at L4-L5 and L5-S1; no disc herniation or nerve root impingement was found. Mild degenerative arthritis of the lower lumbar facet joints was noted; spinal stenosis was not found (R. 213, 366).

On July 27, 2007, Plaintiff informed Jessica Woy, physician assistant to Dr. Bess, that his back pain had improved with physical therapy. Plaintiff informed P.A. Woy that he was concerned that he had sleep apnea due to snoring. P.A. Woy noted Plaintiff's hobbies were hunting, fishing and playing sports. Plaintiff reported he drank "a lot (sic) when he" drank "(once every two weeks - couple six packs or a fifth of whiskey)." P.A. Woy observed Plaintiff was not in any acute distress; her examination of Plaintiff produced normal results. Plaintiff's mood and affect were congruent; he was neurologically intact and psychologically stable. P.A. Woy found degeneration of lumbar disks, but no stenosis or herniation (R. 387). P.A. Woy noted Plaintiff had degenerative joint disease of the right shoulder, knee, ankles and hands. P.A. Woy prescribed Nasacort, Robaxin, Anaprox, Requip, and Chantix. P. A. Woy ordered a sleep study. She instructed Plaintiff to "get regular exercise," such as a "brisk walk for 20-30" minutes, and eat a low fat, low carbohydrate diet. P.A. Woy opined Plaintiff was stable and doing well. P. A. Woy noted Plaintiff's physical therapist, Mike Staggers, "thought [Plaintiff] may even be" malingering (R. 388).

On August 7, 2007, Plaintiff presented to Physician Assistant Woy for follow-up treatment for fluid retention in his legs. Plaintiff informed P.A. Woy that he began retaining fluid when he began medicating with Requip and his fluid retention improved when he discontinued using that medication. Plaintiff denied shortness of breath. P.A. Woy noted Plaintiff's hobbies were hunting, fishing and playing sports. Plaintiff reported he drank "a lot (sic) when he" drank "(once every two weeks - couple six packs or a fifth of whiskey)." P.A. Woy observed Plaintiff was not in any acute distress; her examination of Plaintiff produced normal results. Plaintiff's mood and affect were congruent; he was neurologically intact and psychologically stable. P.A. Woy found degeneration of lumbar disks, but no stenosis or herniation (R. 385). P.A. Woy noted Plaintiff had degenerative

joint disease of the right shoulder, knee, ankles and hands. P.A. Woy prescribed Nasacort, Robaxin, Anaprox, and Chantix. She instructed Plaintiff to "get regular exercise," such as a "brisk walk for 20-30" minutes, and eat a low fat, low carbohydrate diet. P.A. Woy opined Plaintiff was stable and doing well (R. 386).

On August 8, 2007, Plaintiff presented to Dr. Bess for a left acromioclavicular joint injection. Plaintiff "stated after procedure and some time for med to take effect they had good improvement when compared with pre procedure symptoms" (R. 392). Dr. Bess prescribed Nasacort, Robaxin, Anaprox and Chantix. Dr. Bess instructed Plaintiff to "get regular exercise," such as a "brisk walk for 20-30" minutes, and eat a low fat, low carbohydrate diet (R. 393).

On August 10, 2007, Plaintiff presented to Physician Assistant Woy for follow-up treatment for edema. P.A. Woy noted Plaintiff's symptoms had "improved considerably in regards to the edema . . . about 80-90% better." P.A. Woy noted Plaintiff's hobbies were hunting, fishing and playing sports. Plaintiff reported he drank "a lot (sic) when he" drank "(once every two weeks - couple six packs or a fifth of whiskey)." P.A. Woy observed Plaintiff was not in any acute distress; her examination of Plaintiff produced normal results. Plaintiff's mood and affect were congruent; he was neurologically intact and psychologically stable. P.A. Woy found degeneration of lumbar disks, but no stenosis or herniation (R. 383). P.A. Woy noted Plaintiff had degenerative joint disease of the right shoulder, knee, ankles and hands. P.A. Woy prescribed Nasacort, Robaxin, Anaprox, Lasix, K-Dur, and Chantix. She instructed Plaintiff to "get regular exercise," such as a "brisk walk for 20-30" minutes, eat a low fat, low carbohydrate diet, and lose weight. P.A. Woy opined Plaintiff was stable and doing well (R. 384).

On August 30, 2007, Plaintiff presented to Physician Assistant Woy for follow-up treatment

for back pain. Plaintiff stated he still experienced back pain, but it was "some better" due to physical therapy." P.A. Woy noted Plaintiff's hobbies were hunting, fishing and playing sports. Plaintiff reported he drank "a lot (sic) when he" drank "(once every two weeks - couple six packs or a fifth of whiskey)." P.A. Woy observed Plaintiff was not in any acute distress; her examination of Plaintiff produced normal results. Plaintiff's mood and affect were congruent; he was neurologically intact and psychologically stable. P.A. Woy found degeneration of lumbar disks, but no stenosis or herniation (R. 381). P.A. Woy noted Plaintiff had degenerative joint disease of the right shoulder, knee, ankles and hands. P.A. Woy prescribed Nasacort, Robaxin, Anaprox, Lasix, K-Dur, and Lorcet for breakthrough pain. P.A. Woy instructed Plaintiff to "get regular exercise," such as a "brisk walk for 20-30" minutes, and eat a low fat, low carbohydrate diet. P.A. Woy opined Plaintiff was doing well and was stable(R. 382).

On September 19, 2007, Sarim R. Mir, M.D., a neurologist, completed a neurological consultative examination of Plaintiff at the request of Dr. Bess. Plaintiff reported to Dr. Mir that his back pain was axial and did not radiate. Plaintiff realized "partial relief" of his back pain from physical therapy. Plaintiff stated he had no weakness in his lower extremity, no claudication, and no paresthesias. Plaintiff medicated with over-the-counter analgesics and Lorcet, as needed. Plaintiff reported his pain increased with activity. Dr. Mir noted Plaintiff's MRI showed "mild degenerative disc disease at L5-S1," mild degenerative arthritis of the lower lumbar facet joints, but no disc herniation (R. 234).

Plaintiff informed Dr. Mir that he had stopped smoking and he did not drink. Upon examination, Dr. Mir found Plaintiff's blood pressure was 140/72; his respiratory rate was fourteen (14). Plaintiff's height was five (5) feet, nine (9) inches; he weighed "more than 300 pounds

9

according to him." Plaintiff's hand grip was equal bilaterally; he had no dysmetria. Plaintiff's strength was intact in both upper and lower extremities, proximally and distally. Plaintiff had no sensory deficit in his upper or lower extremities. His straight leg raising test was negative, bilaterally. He could walk on his heels and toes; he had no limitation of lumbar flexion or extension on lateral rotation. Dr. Mir observed no lumbar paraspinal tenderness; there was no tenderness over the sacroiliac joints. Dr. Mir opined Plaintiff's neurological examination was "completely unremarkable." He noted Plaintiff had no evidence of foraminal narrowing of his lumbar spine. Dr. Mir found Plaintiff's back pain was likely musculoskeletal. He noted Plaintiff was "morbidly obese and his obesity and physical deconditioning [were] contributing to his pain." Dr. Mir also noted Plaintiff did not "have any symptoms or signs suggestive of a lumbar radiculopathy on exam" (R. 235). Dr. Mir recommended Plaintiff lose weight and continue with physical therapy to alleviate his pain. He advised Plaintiff to take "Lorcet only sparingly for the control of his pain" (R. 236).

Plaintiff returned to Progressive Physical Therapy on August 1, 2007. Physical Therapist Amy Adams found Plaintiff's lower extremity range of motion was within normal limits (R. 238). Plaintiff underwent physical therapy on August 1, 6, 13, 16, 20, 23, 27, and 30, 2007; September 4, 6, 10, 13, 20, 24, and 27, 2007; October 1 and 4, 2007 (240-54).

Plaintiff reported worsening symptoms of shortness of breath, anxiety and depression to Physician Assistant Woy on October 10, 2007. Plaintiff reported he had been evaluated by "[D]r. [D]ey for non-radicular back pain." Plaintiff reported Dr. Dey "felt mostly musculoskeletal and that [Plaintiff] needed to loose (sic) weight, [L]orcet sparingly was given" and Plaintiff should participate in pool physical therapy. P.A. Woy noted Plaintiff's hobbies were hunting, fishing and playing sports. Plaintiff reported he drank "a lot (sic) when he" drank "(once every two weeks - couple six

10

packs or a fifth of whiskey)." P.A. Woy observed Plaintiff was not in any acute distress; her examination of Plaintiff produced normal results. Plaintiff's mood and affect were congruent; he was neurologically intact and psychologically stable. P.A. Woy found degeneration of lumbar disks, but no stenosis or herniation (R. 379). P.A. Woy noted Plaintiff had degenerative joint disease of the right shoulder, knee, ankles and hands. P.A. Woy prescribed Nasacort, Robaxin, Anaprox, Lasix, K-Dur, Lorcet for break through pain, Vistaril for breakthrough anxiety, and Paxil. P.A. Woy instructed Plaintiff to "get regular exercise," such as a "brisk walk for 20-30" minutes, and to eat a low fat, low carbohydrate diet. P.A. Woy opined Plaintiff was doing well and was stable (R. 380).

Dr. Bess referred Plaintiff to Mark Sagin, M.D., for an possible sleep apnea. Plaintiff was evaluated by Dr. Sagin on October 16, 2007. Plaintiff reported snoring, "apparent apneic episodes and gasping respirations." Plaintiff reported he slept from between 11:00 p.m. and 1:00 a.m. to 11:00 a.m. to noon (R. 322). Plaintiff reported that he drank alcohol "modestly and only once per week usually when playing cards with friends" and that he had not smoked cigarettes for the past five (5) months. Dr. Sagin ordered an overnight polysomnography (R. 323).

On October 17, 2007, Plaintiff underwent a cardiolite stress test. It showed reduced ejection fraction of 47% and "a fixed defect due to scarring [was] noted near the apex on the lateral wall and sluggish contraction of the wall motion studies were noted" (R. 257-60, 365).

Plaintiff had a follow-up appointment with Physician Assistant Woy on October 31, 2007, post stress test. Plaintiff reported his symptoms "waxed and waned." His persistent symptoms were for anxiety and depression. Plaintiff reported he "[thought] the [P]axil [was] making to (sic) drousy (sic)." Plaintiff also reported that Vistaril "help[ed] with nerves." P. A. Woy noted Plaintiff's hobbies were hunting, fishing and playing sports. Plaintiff reported he drank "a lot (sic) when he"

drank "(once every two weeks - couple six packs or a fifth of whiskey)." P.A. Woy observed Plaintiff was not in any acute distress; her examination of Plaintiff produced normal results. Plaintiff's mood and affect were congruent; he was neurologically intact and psychologically stable. P.A. Woy found degeneration of lumbar disks, but no stenosis or herniation (R. 377). P.A. Woy noted Plaintiff had degenerative joint disease of the right shoulder, knee, ankles and hands. She prescribed Nasacort, Robaxin, Anaprox, Lasix, K-Dur, Lorcet for break through pain, Vistaril for breakthrough anxiety, and Paxil. P.A. Woy instructed Plaintiff to "get regular exercise," such as a "brisk walk for 20-30" minutes, and to eat a low fat, low carbohydrate diet (R. 378).

Plaintiff's November 2, 2007, echocardiogram showed "trace of tricuspid regurgitation"; trace of mitral regurgitation"; and "left ventricular systolic function appears to be normal with an estimated ejection fraction of 50 to 55%" (R. 255). Plaintiff's echocardiogram was "negative for stress induced ischema." It was noted that "cardiac problems cannot be ruled out completely in view of the low ejection fraction." It was also noted that "further cardiology intervention would be warranted per discretion of his family care physician, Dr. C. Bess" (R. 256, 363-64).

On November 15, 2007, Plaintiff presented to Physician Assistant Woy for a follow up examination for anxiety. Plaintiff reported his symptoms "waxed and waned." P.A. Woy noted his "[p]ersistant/associated symptoms include: want[ed] new med for nerves, last visit said taht (sic) wanted to try without meds." Plaintiff reported he was "concerned" he was bipolar because he had "time of 'highs', (sic) erratic mood changes, depression - and more depression . . . lately." She noted Plaintiff's hobbies were hunting, fishing and sports. Plaintiff reported he drank "a lot (sic) when he" drank "(once every two weeks - couple six packs or a fifth of whiskey)." P.A. Woy observed Plaintiff was not in any acute distress; her examination of Plaintiff produced normal results.

Plaintiff's mood and affect were congruent; he was neurologically intact and psychologically stable (R. 375). She found degeneration of lumbar disks, but no stenosis or herniation, and degenerative joint disease of the right shoulder, knee, ankles and hands and prescribed Zoloft, Nasacort, Robaxin, Anaprox, Lasix, K-Dur, Lorcet, and Vistaril. P.A. Woy instructed Plaintiff to "get regular exercise," such as a "brisk walk for 20-30" minutes, and eat a low fat, low carbohydrate diet (R. 375-76).

Plaintiff completed an overnight sleep study on November 19, 2007. Dr. Sagin opined the following: "Although limited recording time during sleep was available fairly severe sleep apnea was identified manifested by repetitive apneic and hypopneic events and desaturation into the mid 80% range. A trial of continuous positive airway pressure is recommended in addition to weight reduction" (R. 263, 316, 318-21, 367-73).

On December 7, 2007, Plaintiff completed a continuous positive airway pressure ("CPAP") study. Dr. Sagin found that this study was "much better sustained" than the November 19, 2007, study. Plaintiff's sleep efficiency was seventy-seven percent (77%) and his total sleep time was six (6) hours and fifteen (15) minutes. Dr. Sagin found Plaintiffs REM sleep was limited and "confined to the latter half of the night." Dr. Sagin opined the following: "Severe obstructive sleep apnea particularly when positioned supine. Continuous positive airway pressure had little impact on his sleep disordered breathing in the supine position but on his side at 17 cm H2O pressure despite some continued snoring most of his obstructive events were eliminated with the presence of sustained sleep" (R. 261, 309, 311-15, 357-62).

On December 11, 2007, Plaintiff reported to Physician Assistant Woy that his sleep apnea "symptoms [had] stayed about the same," and he had been fitted for a CPAP machine. His hobbies were hunting, fishing and playing sports. Plaintiff reported he drank "a lot (sic) when he" drank

"(once every two weeks - couple six packs or a fifth of whiskey)." P.A. Woy observed Plaintiff was

not in any acute distress; her examination of Plaintiff produced normal results. Plaintiff's mood and

affect were congruent; he was neurologically intact and psychologically stable. P.A. Woy found

degeneration of lumbar disks, but no stenosis or herniation (R. 373). She found Plaintiff had

degenerative joint disease of the right shoulder, knee, ankles and hands. She opined Plaintiff was

"stable and doing well." She prescribed Nasacort, Robaxin, Anaprox, Lorcet for breakthrough pain,

Vistaril for breakthrough anxiety, and Zoloft. She instructed Plaintiff to eat a low fat, low

carbohydrate diet and "get regular exercise," such as walking briskly for about thirty (30) minutes

per day (R. 374).

On December 14, 2007, Plaintiff reported to V. K. Suresh Rajan, M.D., a psychiatrist, that

he was depressed and anxious. Plaintiff had never been treated by a psychiatrist prior to this visit.

Plaintiff reported he "used to smoke" (R. 278). Dr. Rajan found Plaintiff was alert and oriented,

times three. He had no delusions or hallucinations. Dr. Rajan diagnosed major depression and panic

attacks. He prescribed Lexapro and Klonopin (R. 279).

Dr. Sagin prescribed a CPAP machine for Plaintiff on December 17, 2007 (R. 324).

On January 15, 2008, Fulvio Franyutti, M.D., completed a Physical Residual Functional

Capacity Assessment of Plaintiff. Dr. Franyutti found Plaintiff could occasionally lift and/or carry

fifty pounds; frequently lift and/or carry twenty-five pounds; stand and/or walk for about six hours

in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and unlimited

push/pull (R. 271). Dr. Franyutti found Plaintiff could frequently balance, stoop, and kneel;

occasionally climb ramps/stairs, crouch and crawl; and never climb ladders/ropes/scaffolds (R. 272).

Dr. Franyutti found Plaintiff had no manipulative, visual or communicative limitations (R. 273-74).

14

Dr. Franyutti found Plaintiff was unlimited in his exposure to extreme heat, wetness, humidity and noise. Plaintiff should avoid concentrated exposure to extreme cold, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards (R. 274).

Dr. Franyutti noted Plaintiff had difficulty putting on socks and shoes; prepared his own meals; did laundry; cut grass on a tractor; drove; lifted ten (10) pounds; could not squat, bend, reach; walked one-hundred (100) yards; did not use assistive devices. Dr. Franyutti found Plaintiff was partially credible and noted he could possibly "improve his symptoms & limitations with a significant weight loss, a prescribed DIET & a Monitored Exercise program" (R. 275). Dr. Franyutti relied on the medical records of Dr. Bess, sleep study results, and physical therapy records (R. 277).

On January 24, 2008, Dr. Rajan completed a Routine Abstract Form Mental. Dr. Rajan opined Plaintiff's speech was normal; he had no delusions or hallucinations; he was oriented, times three; his affect was restricted; his mood was depressed, anxious, irritable and sad; his judgment, perception, insight, and thought content were normal. Dr. Rajan found Plaintiff's immediate and recent memories, social functioning, concentration, persistence, and pace were moderately deficient. Dr. Rajan diagnosed major depression and anxiety; he found Plaintiff's physical impairments were obesity and sleep apnea. Plaintiff's prescriptions for Lexapro and Klonopin were renewed. Dr. Rajan found Plaintiff was unable to work "because of his depression, anxiety and physical ailments" (R. 282-85).

Plaintiff was examined by Dr. Sagin on January 29, 2008. He reported he used his CPAP machine "consistently," but awoke during the night with a "mask leak." Plaintiff's wife reported Plaintiff's snoring had been eliminated. Plaintiff reported he was still fatigued. Dr. Sagin found Plaintiff's compliance was seven (7) hours and sixteen (16) minutes. Dr. Sagin instructed Plaintiff

to sleep on his side because his apnea "would be adequately controlled on his side." Dr. Sagin provided samples of Modafinil and instructed Plaintiff to return in six (6) weeks (R. 324).

On February 1, 2008, Bob Marinelli, Ed.D., completed a Psychiatric Review Technique of Plaintiff. He found Plaintiff had major depressive disorder with anxiety, an affective disorder (R. 286, 289). Dr. Marinelli found Plaintiff was moderately limited in his activities of daily living; mildly limited in his social functioning, and moderately limited in his ability to maintain concentration, persistence or pace (R. 296).

Also on February 1, 2008, Dr. Marinelli completed a Mental Residual Functional Capacity Assessment of Plaintiff. He found that Plaintiff's mental residual functional capacity was "reduced by moderate limitations in memory, concentration, sustained persistence & adapting to change. He has the capacity for routine competitive employment involving short & simple instructions with low pressure & adaptive demands" (R. 300-02).

On February 11, 2008, Plaintiff was treated by Dr. Rajan; he was alert and oriented, times three. His mood was depressed. Dr. Rajan renewed Plaintiff's prescriptions for Lexapro and Klonipin (R. 334, 338).

Plaintiff's wife informed Dr. Sagin's office, on February 13, 2008, that Plaintiff was still snoring, "but not as bad" and that Provigil was "helping" (R. 325).

On March 10, 2008, Plaintiff was treated by Dr. Rajan; he was alert and oriented, times three. His mood was depressed. Dr. Rajan renewed Plaintiff's prescriptions for Lexapro and Klonipin (R. 334, 338).

Plaintiff returned to Dr. Sagin on March 18, 2008. He reported waking more frequently when he used less CPAP pressure. Plaintiff stated he slept on his side "most of his time." Plaintiff

16

reported continued daytime sleepiness. Plaintiff stated he did not use Modafinil consistently. Dr. Sagin noted Plaintiff's compliance usage was 91.8% with an average use of "only 4 hours and 21 minutes." Dr. Sagin found "fairly severe obstructive sleep apnea when positioned supine with continuous positive airway pressure ineffective in this position. . . ."; however the "data from his CPAP machine suggests effectiveness at his current pressure setting when on his side" (R. 325). Dr. Sagin "told . . . [Plaintiff] that he need[ed] to use [Modafinil] consistently" because he did have a "positive response" initially to that medication (R. 326, 353).

Plaintiff phoned Dr. Sagin on March 26, 2008, to report that Provigil was not "working that great." Dr. Sagin instructed Plaintiff to medicate with Modafinil (R. 326).

On April 10, 2008, Dr. Rajan noted Plaintiff was alert and oriented, times three. His mood was depressed and his affect was sad. Dr. Rajan renewed Plaintiff's prescriptions for Lexapro and Klonipin (R. 334, 337).

On May 21, 2008, Jim Capage, Ph.D., affirmed Dr. Marinelli's February 1, 2008, Psychiatric Review Technique and Mental Residual Functional Capacity Assessment of Plaintiff (R. 330).

On May 27, 2008, Cindy Osborne, D.O., "reviewed all the pertinent medical evidence in file and assessment of 1/15/08" and affirmed same (R. 331).

On June 5, 2008, Plaintiff was treated by Dr. Rajan; he was alert and oriented, times three. His mood was depressed. Dr. Rajan renewed Plaintiff's prescriptions for Lexapro and Klonipin (R. 334, 337).

On July 7, 2008, Plaintiff was treated by Dr. Rajan; he was alert and oriented, times three. His mood was depressed. Dr. Rajan renewed Plaintiff's prescriptions for Lexapro and Klonipin (R. 334, 336).

On July 7, 2008, Plaintiff reported to Dr. Sagin that he slept in the prone position and not on his side, awoke more frequently and that Modafinil did not cause him to "feel more alert through the day." Plaintiff reported constant fatigue and sleepiness. Dr. Sagin diagnosed moderately severe obstructive sleep apnea, which was "most pronounced when supine." Plaintiff stated he was not "able to sleep on his side with his current mask and is unwilling to try a nasal mask which he [did] not feel that he would tolerate." Plaintiff's wife did "not report snoring with the mask in place." Dr. Sagin instructed Plaintiff to stop medicating with Modafinil and prescribed Zolpidem. He told Plaintiff to return in six (6) months (R. 354).

Plaintiff was evaluated by Dr. Bess on August 5, 2008, for complaints of edema, right inguinal pain, and shoulder pain. Plaintiff reported that the conservative treatment he had been receiving for his shoulder pain had "not helped"; he requested an injection. Dr. Bess observed that Plaintiff had "relatively normal activity" and no changes in his level of activity. Plaintiff's mental status was unchanged; Plaintiff reported his symptoms were no "better or worse with anything [he] [did] or [did] not do" and that the duration of his symptoms was "weeks and weeks." Plaintiff's hobbies included hunting, fishing, and participating in sports. He reported he "[drank] a lot (sic) when he drinks. . . . Once every two weeks – couple six packs or a fifth of whiskey." Dr. Bess injected Plaintiff's right shoulder with Lidocaine and Kenalog. Plaintiff stated that "after procedure and some time for med to take effect they had excellent improvement when compared with pre procedure symptoms." Plaintiff's mood and affect were stable and congruent. Dr. Bess's examination of Plaintiff produced normal results (R. 345). Dr. Bess noted Plaintiff had degeneration of the lumbar area but had no stenosis or herniations and no lumbar sprain. Dr. Bess found Plaintiff had degenerative joint disease of the "right shoulder, knee, ankles and hands." Plaintiff had full

ranges of motion, no joint swelling, no tenderness. Plaintiff's gait was stable and his neurologic examination was "grossly normal." Dr. Bess prescribed Mycolog, Nasacort, and Diflucan and instructed Plaintiff to eat a low-fat, low carbohydrate diet (R. 346).

Plaintiff's August 8, 2008, echocardiogram showed the following: 1) no significant pericardial effusion; mild left ventricular hypertrophy without any evidence of focal wall motion abnormality and an ejection fraction of fifty-five (55) to sixty (60) percent; no significant valvular regurgitation or stenosis; no significant chamber dilatation; and aortic root ectasia measuring four (4) cm (R. 351).

On August 14, 2008, Dr. Rajan noted Plaintiff was alert and oriented, times three. His mood was depressed and his affect was sad. Dr. Rajan renewed Plaintiff's prescriptions for Lexapro and Klonipin (R. 334, 336).

On September 18, 2008, Plaintiff reported to Dr. Rajan that he "just [went] to church" and was "hoping to have [his] disability come through." He was oriented, time three. His mood was depressed; his affect was sad (R. 333).

On September 30, 2008, Plaintiff presented to Dr. Bess for follow-up to his hip complaints. Plaintiff informed Dr. Bess that his hip was "much[,] much better." Plaintiff stated he experienced low back pain, which was "off and on for past yr or more." Plaintiff reported his leg swelling was "better." He had no shortness of breath; his fatigue was stable; he experienced no side effects from his medications. Plaintiff stated the pain he experienced due to his degenerative joint disease was moderate to severe and varied. Dr. Bess noted "[t]he severity of [Plaintiff's] chronic illness has . . . remained stable and no severe sequela." Plaintiff's hobbies included hunting, fishing, and participating in sports. He reported he "[drank] a lot (sic) when he drinks. . . . Once every two weeks

– couple six packs or a fifth of whiskey." Dr. Bess found Plaintiff was morbidly obese. His psychiatric examination was "stable" with "no appreciable change in judgement (sic) or reasoning ability." Plaintiff's mood and affect were stable and congruent. Dr. Bess's examination of Plaintiff produced normal results (R. 343). Dr. Bess noted Plaintiff had degeneration of the lumbar area but had no stenosis or herniations and no lumbar sprain. Dr. Bess found Plaintiff had degenerative joint disease of the "right shoulder, knee, ankles and hands." Plaintiff had full ranges of motion, no joint swelling, no tenderness. Plaintiff's gait was stable and his neurologic examination was "grossly normal." Dr. Bess prescribed Lotnisone, Diflucan, Nasacort, Lorcet, and Elocon and instructed Plaintiff to eat a low-fat, low carbohydrate diet (R. 344).

On October 13, 2008, Dr. Rajan noted Plaintiff was alert and oriented, times three. His mood was depressed and his affect was sad (R. 333).

On October 15, 2008, Plaintiff was evaluated by Dr. Bess for a rash; he had a lesion on his forearm excised. Dr. Bess noted Plaintiff's sleep apnea was stable. Plaintiff's hobbies included hunting, fishing, and participating in sports. He reported he "[drank] a lot (sic) when he drinks. . . . Once every two weeks – couple six packs or a fifth of whiskey." Dr. Bess found Plaintiff was morbidly obese. His psychiatric examination was "stable" with "no appreciable change in judgement (sic) or reasoning ability." Plaintiff's mood and affect were stable and congruent. Dr. Bess's examination of Plaintiff produced normal results (R. 340). Dr. Bess noted Plaintiff had degeneration of the lumbar area but had no stenosis or herniations and no lumbar sprain. Dr. Bess found Plaintiff had degenerative joint disease of the "right shoulder, knee, ankles and hands." Plaintiff had full ranges of motion, no joint swelling, no tenderness. Plaintiff's gait was stable and his neurologic examination was "grossly normal." Dr. Bess prescribed Nasacort, Lorcet, and Elocon and instructed

Plaintiff to eat a low-fat, low carbohydrate diet (R. 341).

Plaintiff underwent pulmonary function testing on November 12, 2008. It showed moderate obstructive pulmonary impairment (R. 406).

Dr. Rajan completed a Mental Residual Functional Capacity Questionnaire of Plaintiff on November 12, 2008. He noted he had been treating Plaintiff for once a month since December 2007. His diagnosis was moderate major depressive disorder. He treated Plaintiff with Lexapro and Klonopin. Dr. Rajan listed the clinical findings as "severe depression, lack of energy, . . . anxiety, suicidal ideation." He listed Plaintiff's prognosis as "guarded" (R. 400). Dr. Rajan listed the following signs and symptoms to support his findings as to Plaintiff: anhedonia or pervasive loss of interest in almost all activities; appetite and weight changes; decreased energy; thoughts of suicide; blunt, flat or inappropriate affect; feelings of guilt or worthlessness; generalized persistent anxiety; somatization; persistent mood disturbance; psychomotor retardation; impaired memory; and sleep disturbances (R. 401). Dr. Rajan found Plaintiff was unable to meet the competitive standards in the mental abilities and aptitudes needed to do unskilled work and particular types of jobs (R. 402-03). Dr. Rajan found Plaintiff's IQ was normal. He found that Plaintiff's back and leg pain syndromes were exacerbated by his psychiatric condition (R. 403). Dr. Rajan noted Plaintiff would be absent from work more than four (4) days per month; his impairment would last at least twelve (12) months; and his symptoms were consistent with his impairments (R. 404).

Plaintiff was evaluated by Dr. Bess on November 13, 2008, for a persistent cough. Plaintiff's psychiatric examination was "stable"; his judgment and reasoning were unchanged. Plaintiff's mood and affect were stable and congruent. Dr. Bess's examination of Plaintiff produced normal results. Plaintiff had full ranges of motion, no joint swelling, no tenderness. His gait was stable and his

21

neurologic examination was "grossly normal" (R. 421). He found Plaintiff had degenerative joint disease of the "right shoulder, knee, ankles and hands." Dr. Bess noted Plaintiff had degeneration of the lumbar area but had no stenosis or herniations and no lumbar sprain. Dr. Bess prescribed Robitussin, Nasacort, Provigil, Lorcet, and Albuterol and instructed Plaintiff to eat a low-fat, low carbohydrate diet. Dr. Bess noted Dr. Sagin had prescribed the use of a CPAP machine (R. 422).

On November 25, 2008, Plaintiff reported bilateral leg and right thigh pain to Dr. Bess. Dr. Bess noted that Plaintiff's symptoms "started after deer hunting yesterday." Dr. Bess observed Plaintiff had normal activity, no mental status changes, and no change in his level of activity. Plaintiff's psychiatric examination was "stable"; his judgment and reasoning were unchanged. Plaintiff's mood and affect were stable and congruent. Dr. Bess's examination of Plaintiff produced normal results. Plaintiff had full ranges of motion, no joint swelling, no tenderness. His gait was stable and his neurologic examination was "grossly normal" (R. 419). He found Plaintiff had degenerative joint disease of the "right shoulder, knee, ankles and hands." Dr. Bess noted Plaintiff had degeneration of the lumbar area but had no stenosis or herniations and no lumbar sprain. Dr. Bess prescribed Nasacort, Provigil, Meloxicam, Lorcet, and Albuterol and instructed Plaintiff to eat a low-fat, low carbohydrate diet. Dr. Bess noted Dr. Sagin had prescribed the use of a CPAP machine (R. 420).

A duplex venous Doppler examination of Plaintiff's right and left lower extremities was made on November 25, 2008. It was normal (R. 439).

On December 2, 2008, Plaintiff reported to Dr. Bess that his leg symptoms had improved and he had "much improved sleep with cpap and significant daytime fatigue." Dr. Bess noted Plaintiff's symptoms were stable. Plaintiff reported he was not "getting joy of the things in life." His

psychiatric examination was "stable"; his judgment and reasoning were unchanged. Plaintiff's mood and affect were stable and congruent. Dr. Bess's examination of Plaintiff produced normal results. Plaintiff had full ranges of motion, no joint swelling, no tenderness. His gait was stable and his neurologic examination was "grossly normal." Dr. Bess noted Plaintiff had degeneration of the lumbar area but had no stenosis or herniations and no lumbar sprain (R. 417). He found Plaintiff had degenerative joint disease of the "right shoulder, knee, ankles and hands." Dr. Bess prescribed Nasacort, Provigil, Meloxicam, Lorcet, and Albuterol and instructed Plaintiff to eat a low-fat, low carbohydrate diet. Dr. Bess noted Dr. Sagin had prescribed the use of a CPAP machine. Dr. Bess informed Plaintiff that he needed regular exercise, "an exercise program that [got] heart rate up for 20-30 minutes several times a week." Dr. Bess advised Plaintiff to lose weight. The "[i]mportance of patient involvement in their healthcare including a proactive preventative stance was stressed and [d]iet/eating habits and how it impacts overall health. [S]ee [D]r. [R]ajan as I feel some of prob related to depression" (R. 418).

Plaintiff was treated by Dr. Gregory Arnold, M.D., a pain management specialist, on December 9, 2008, for right groin pain. Plaintiff stated he had occasional groin numbness, back pain with "some pain radiating down his thighs although the predominant area of pain is pain in his right groin." Plaintiff reported he medicated with Hydrocodone and Tylenol. Dr. Arnold's review of Plaintiff's "systems" was "essentially unremarkable" (R. 445). Upon examination, Dr. Arnold found no pain to palpation in Plaintiff's lumbar area. His strength was 5/5 in the lower extremities; his straight leg raising test was negative, bilaterally. Plaintiff's right groin sensation was intact; he had "minimal diffuse tenderness to palpation over" his right groin area. Dr. Arnold reviewed Plaintiff's July 25, 2007, MRI of his lumbar spine, which showed mild degenerative and degenerative disk

disease, but no herniation, impingement or stenosis. He opined that Plaintiff's pain was not "coming from a lumbar radiculopathy type of pattern but rather from ilioinguinal neuralgia." Dr. Arnold prescribed Lyrica and noted he would schedule Plaintiff for an ilioinguinal nerve block "if" Plaintiff did "not get pain relief from the medication" (R. 443).

On December 16, 2008, Dr. Chisholm noted that Plaintiff had been referred to him for right groin pain by Dr. Bess. Plaintiff described his pain as being present in his right inguinal canal areas, scrotum, and both anterior thighs. Plaintiff reported his pain occurred with daily activities. Plaintiff reported he was being treated by a pain management specialist for his "groin and back," was medicating with Lyrica and Tramadol, and had "not noticed any difference as yet in the one week since starting." Plaintiff informed Dr. Chisholm he also medicated with Neurontin (R. 436). Plaintiff's neck, chest, cardiovascular, gastrointestinal, and lymphatic examinations were normal (R. 437). Dr. Chisholm found Plaintiff's judgment and insight were intact; he had normal mood and affect; his sensation was intact; he had normal gait and was able to stand without difficulty. Dr. Chisholm diagnosed groin strain and obesity. Dr. Chisholm instructed Plaintiff to continue being treated by a pain management specialist (R. 438).

On January, 6, 2009, Plaintiff reported to Dr. Bess that his sacroiliac joint pain had "gotten worse." Plaintiff stated his leg pain was "worse and no better with [L]yrica or other meds and depression stable." Plaintiff reported he was being treated by Dr. Greg Arnold, a pain specialist and that his pain was "no better." His psychiatric examination was "stable"; his judgment and reasoning were unchanged. Plaintiff's mood and affect were stable and congruent. Dr. Bess's examination of Plaintiff produced normal results. Plaintiff had full ranges of motion, no joint swelling, no tenderness. His gait was stable and his neurologic examination was "grossly normal." Dr. Bess

noted Plaintiff had degeneration of the lumbar area but had no stenosis or herniations and no lumbar sprain (R. 415). He found Plaintiff had degenerative joint disease of the "right shoulder, knee, ankles and hands." Dr. Bess prescribed Nasacort, Meloxicam, Lorcet, Lexapro, Albuterol, Lyrica, and Lexapro and instructed Plaintiff to eat a low-fat, low carbohydrate diet. Dr. Bess noted Dr. Sagin had prescribed the use of a CPAP machine and Dr. Rajan had prescribed Clonazepam (R. 414).

On February 3, 2009, Plaintiff reported to Dr. Bess that his sacroiliac joint was "much better and seeing PT with success." Plaintiff reported he was being treated by a pain specialist. Dr. Bess noted the "severity of [Plaintiff's] chronic illnesses has . . . remained stable and no severe sequela." His psychiatric examination was "stable"; his judgment and reasoning were unchanged. Plaintiff's mood and affect were stable and congruent. Dr. Bess's examination of Plaintiff produced normal results. Plaintiff had full ranges of motion, no joint swelling, no tenderness. Plaintiff's gait was stable and his neurologic examination was "grossly normal" (R. 413). Dr. Bess noted Plaintiff had degeneration of the lumbar area but had no stenosis or herniations and no lumbar sprain. He found Plaintiff had degenerative joint disease of the "right shoulder, knee, ankles and hands." Dr. Bess prescribed Lortab, Albuterol, Lyrica, and Lexapro and instructed Plaintiff to eat a low-fat, low carbohydrate diet. Dr. Bess noted Dr. Sagin had prescribed the use of a CPAP machine and Dr. Rajan had prescribed Clonazepam (R. 414).

Plaintiff was evaluated by Dr. Sagin on February 19, 2009. He noted Plaintiff had "been using his CPAP consistently and sleeping in the prone position with his wife noting only an occasional snoring sound. He often will remain in bed for as long as 9-10 hours and despite this still feels that he could drift off to sleep." Dr. Sagin also noted that Plaintiff "[felt] better than before he started on CPAP." Plaintiff's CPAP compliance was one-hundred percent (100%) from October,

2008, to February, 2009 (R. 442).

On April 24, 2009, Dr. James Wiedower, M.D., completed a pre-gastric bypass operation examination of Plaintiff. Plaintiff informed Dr. Wiedower that his physician told him to lose weight in order to improve his back and sciatica pain. Plaintiff reported he quit smoking, used a CPAP machine, was chronically tired, had shortness of breath, and snored heavily (R. 428). Plaintiff reported he occasionally drank, hunted, and worked on vehicles (R. 431). Dr. Wiedower's physical examination showed Plaintiff was alert, cooperative, and in no distress. His HEENT, neck, respiratory, cardiovascular, lymphatic, and abdominal examinations were normal. Plaintiff's musculoskeletal examination produced "grossly normal" ranges of motion; he was oriented, times four, and his mood and affect were normal (R. 432-33). Dr. Wiedower diagnosed diabetes; hyperlipidemia; dysmetabolic syndrome; stable morbid obesity; stable depressive disorder; stable, but poorly controlled, obstructive sleep apnea; chronic liver disease; and unspecified, but stable, backache (R. 433). Dr. Wiedower informed Plaintiff that he would have to lose up to ten (10) percent of his body weight prior to surgery. Dr. Wiedower noted Plaintiff had "significant medical issues which result in increased risk of death from obesity as well as increasing his operative risk" (R. 435).

On April 28, 2009, Plaintiff presented to Dr. Bess for a follow-up examination of "stable controlled [d]iabetes, HTN and hypercholesterolemia." Plaintiff was not fatigued and had no shortness of breath. Dr. Bess noted the "severity of [Plaintiff's] chronic illnesses ha[d] otherwise remained stable and no severe sequela." His psychiatric examination was "stable"; his judgment and reasoning were unchanged. Plaintiff's mood and affect were stable and congruent. Dr. Bess's examination of Plaintiff produced normal results. Plaintiff had full ranges of motion, no joint swelling, no tenderness. Plaintiff's gait was stable and his neurologic examination was "grossly

26

normal" (R. 411). Dr. Bess noted Plaintiff had degeneration of the lumbar area but had no stenosis or herniations and no lumbar sprain. He found Plaintiff had degenerative joint disease of the "right shoulder, knee, ankles and hands." Dr. Bess prescribed Lortab, Albuterol, Lyrica, and Lexapro and instructed Plaintiff to eat a low-fat, low carbohydrate diet. Dr. Bess noted Dr. Sagin had prescribed the use of a CPAP machine and Dr. Rajan had prescribed Clonazepam (R. 412).

On June 23, 2009, Dr. Bess examined Plaintiff for left knee pain. Plaintiff reported he had been scheduled for gastric by-pass surgery, but, due to his "breathing," the procedure was "put on hold until he sees breathing Dr. and he gives him ok to be put under." Plaintiff reported he had experienced knee pain for the past four (4) months and that Ibuprofen did not ease the pain. Dr. Bess found Plaintiff was morbidly obese. His psychiatric examination was "stable"; his judgment and reasoning were unchanged. Plaintiff's mood and affect were stable and congruent. Dr. Bess's examination of Plaintiff produced normal results. Plaintiff had full ranges of motion, no joint swelling, no tenderness. Plaintiff's gait was stable and his neurologic examination was "grossly normal" (R. 409). Dr. Bess noted Plaintiff had degeneration of the lumbar area but had no stenosis or herniations and no lumbar sprain. He found Plaintiff had degenerative joint disease of the "right shoulder, knee, ankles and hands." Dr. Bess prescribed Meloxicam, Lortab, Albuterol, Lyrica, and Lexapro and instructed Plaintiff to eat a low-fat, low carbohydrate diet. Dr. Bess noted Dr. Sagin had prescribed the use of a CPAP machine and Dr. Rajan had prescribed Clonazepam (R. 410).

Administrative Hearing

Plaintiff testified at the administrative hearing that he drove once or twice weekly (34). Plaintiff testified he slept twelve (12) hours per night (R. 36). Plaintiff stated he did not sleep in the day. He watched television, received visitors "two or three times a week," read, and used the

27

computer for about forty-five (45) minutes and stopped due to "boredom" (R. 37). Plaintiff could "bend down and pick up clothing from the floor." He could not "take a tub bath." Plaintiff testified he did not hunt or fish during the past season due to his difficulty with breathing and the "cartilage in . . . [his] knees, but he "normally" hunted and fished (R. 38). Plaintiff testified he could crawl. He could remain seated for one hour; he could only stand for ten (10) to fifteen (15) minutes due to back and knee pain. Plaintiff could walk for fifty (50) feet before he became breathless. Plaintiff could lift a gallon of milk (R. 39). Plaintiff testified he could not work as a cashier at a convenience store because he could not "deal with the public" and could not stand for eight hours. Plaintiff did not know if he could sell tickets at a movie theater (R. 42). Plaintiff testified he had to stop getting dressed mid-way though due to fatigue. Plaintiff stated he did not mow the grass or often take out the trash (R. 46). Plaintiff stated he could not reach overhead "very good" (R. 47). Plaintiff testified he had difficulty bending at the waist but did not wear a truss (R. 50). Plaintiff testified he could not "do the physical activities that [he] used to be able to do because of the fact that it's hard for [him] to breathe, and that's about it" (R. 49).

Plaintiff testified he has restless leg syndrome (R. 34). Plaintiff testified he had "crying spells" once every two (2) or three (3) weeks, that he had suicidal thoughts in the past, and his depression predated his physical conditions. Plaintiff had never been hospitalized for depression. Plaintiff testified he had "problems with concentration (R. 40). Plaintiff stated he "forget[s] everything." He had difficulty "sometimes just comprehending what people" said to him (R. 41). Plaintiff testified he got agitated and angry easily (R. 43). Plaintiff stated he "lost 30 percent movement in [his] right [shoulder] when [he] was 18 years old" as a result of a motorcycle accident (R. 47). Plaintiff testified he did not have limitations gripping and grasping with his hands (R. 48).

Plaintiff testified he did not wear a back brace, use a TENS unit, or walk with a cane (R. 35). Plaintiff stated he received injections in his back, and the most recent injection "helped for about . . . a month" (R. 35-36). Plaintiff testified he did not use a nebulizer, but he used a CPAP machine. The CPAP machine helped Plaintiff to "sleep through the night" but it did wake him up from "time to time" (R. 36). Plaintiff testified he received cortisone injections in his knees and shoulder (R. 38). Plaintiff reported he had no side effects from the medication. Plaintiff stated he visited his doctors every two (2) or three (3) months, but he saw his psychiatrist once every month (R. 39). Plaintiff testified the medication he took for his mental impairment "helped . . . some" (R. 44).

### III.  ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ Pace made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2010 (Exhibit 2D, page 2) (R. 11).

2. The claimant has not engaged in substantial gainful activity since February 2, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*) (R. 11).

3. The claimant has the following severe impairments: obesity, an affective disorder with anxiety and depression, obstructive sleep apnea, mild degenerative disc disease, degenerative joint disease, history of hernia repair with residual groin pain, chronic obstructive pulmonary disease (20 CFR 404.1520(c) (R. 11).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526) (R. 12).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except as a result of the claimant's weight, shortness of breath, back condition, and subjective complaints, the claimant

is further limited to no heights, steps, or hazardous machinery; occasional bending beyond the waist; no pushing and pulling; and work level surfaces only. Out of deference to his respiratory problems, right shoulder injury, and knee problems, the claimant is limited to work with occasional stooping; no overhead reaching, squatting, crawling, or kneeling; and minimal exposure to environmental irritants or temperature extremes. Furthermore, as a result of the claimant's mental impairments Mr. Watson is limited to unskilled work that involves minimal interaction with the public (R. 14).

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565) (R. 19).

7.    The claimant was born on May 8, 1961 and was 45 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 CFR 404.1563) (R. 19).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564) (R. 19).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2) (R. 19).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)) (R. 19).

11.    The claimant was not under a disability, as defined in the Social Security Act, at any time from February 2, 2007, the alleged onset date, through December 31, 2007, the date last insured (20 CFR 404.1520(g)) (R. 20).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The

Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" *Hays*, 907 F.2d at 1456 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

Plaintiff contends:

1.     The ALJ erred because he "wholly rejects the treating source medical opinion and further fails to set forth any basis for such rejection" (Plaintiff's brief at p. 8).

2.     "In concluding that the Plaintiff retained the residual functional capacity to perform sedentary work with certain restrictions, the Administrative Law Judge failed to evaluate the Plaintiff's complaint of pain and how that pain impacts on his residual functional capacity" (Plaintiff's brief at p. 8).

3.     In finding Plaintiff's impairments did not equal or meet sections 1.02 and 1.04, the ALJ "did not fairly and adequately consider whether or not those listings were met based on the medical evidence of record nor did she (sic) consider the possibility of whether or not the Plaintiff's condition was the

medical equivalent of the listing of impairments as noted in 20 CFR 404.1526" (Plaintiff's brief at p. 10).

The Commissioner contends:

1.    The ALJ properly considered the opinions of Plaintiff's treating physicians (Defendant's brief at p. 5).

2.    The ALJ properly found that plaintiff's subjective complaints were not entirely credible (Defendant's brief at p. 9).

3.    The ALJ properly found that Plaintiff did not meet or equal a listed impairment (Defendant's brief at p. 10).

## C. Treating Physician

Plaintiff asserts the his "treating physician (sic) at the time[] should be given controlling weight in this case per SSR 96-2p" and that "under the definition of treating source, Drs. Bess, Chisholm, and Sagin ('treating physicians') would be considered as such, having treated the Plaintiff for the past several years" (Plaintiff's brief at p. 6). Plaintiff further asserts that the ALJ's decision "wholly rejects the treating source medical opinion and further fails to set forth any basis for such rejection" (Plaintiff's brief at p. 8). Defendant argues that the ALJ properly considered the opinions of Plaintiff's treating physicians.

20 CFR 404.1520 defines "treating source" as follows:

*Treating source* means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s). We will not consider an acceptable medical source to be your treating source if your

relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability. In such a case, we will consider the acceptable medical source to be a nontreating source.

Dr. Bess was Plaintiff's primary care physician for more than two (2) years; Dr Chisholm treated Plaintiff's hernia from March, 2006, through August, 2006, and December, 2008; and Dr. Sagin treated Plaintiff's sleep apnea from October, 2007, through February, 2009. These doctors qualify as treating physicians and the ALJ recognized them as such (R. 16-18).

Social Security Regulation 96-2p holds, in part, the following:

Controlling weight. This is the term used in 20 CFR 404.1527(d)(2) and 416.927(d)(2) to describe the weight we give to a medical opinion from a treating source that must be adopted. The rule on controlling weight applies when all of the following are present:

1. The opinion must come from a "treating source," as defined in 20 CFR 404.1502 and 416.902. Although opinions from other acceptable medical sources may be entitled to great weight, and may even be entitled to more weight than a treating source's opinion in appropriate circumstances, opinions from sources other than treating sources can never be entitled to "controlling weight."

2. The opinion must be a "medical opinion." Under 20 CFR 404.1527(a) and 416.927(a), "medical opinions" are opinions about the nature and severity of an individual's impairment(s) and are the only opinions that may be entitled to controlling weight. (See SSR 96-5p, "Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner.")

3. The adjudicator must find that the treating source's medical opinion is "well-supported" by "medically acceptable" clinical and laboratory diagnostic techniques. The adjudicator cannot decide a case in reliance on a medical opinion without some reasonable support for the opinion.

4. Even if well-supported by medically acceptable clinical and laboratory diagnostic techniques, the treating source's medical

> opinion also must be "not inconsistent" with the other
> "substantial evidence" in the individual's case record.

If any of the above factors is not satisfied, a treating source's opinion cannot be entitled to controlling weight. It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record. However, when all of the factors are satisfied, the adjudicator must adopt a treating source's medical opinion irrespective of any finding he or she would have made in the absence of the medical opinion.

"Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." *Craig v. Chater*, 76 F. 3d 585, 589 (4th Cir. 1996). The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Mitchell v. Schweiker*, 699 F.2d 185 (4th Cir. 1983).

The ALJ assigned "great weight" to the opinions of Dr. Chisholm. He found the following:

> Prior to the alleged onset date, the medical evidence reflects the claimant's history of right inguinal hernia repairs (Exhibit 1F). In 2006, the claimant underwent a right ilioinguinal nerve separation and was found not to have a hernia (Exhibit 1F, page 3). In August of 2006, Dr. Chisholm recorded that the claimant was doing fairly well with occasional pain in the right groin area (Exhibit 1F, page 4). He opined that it would be helpful if the claimant pursued work activity that did not involve so much strenuous lifting (Exhibit 2F). The undersigned gives this opinion great weight because it is generally consistent wit the medical evidence of record (R. 16).

The records from Dr. Chisholm also contain Plaintiff's August 4, 2006, comment to him that he did not treat his right groin pain with "any anti-inflammatories, heat or ice as he just [did] not think about it much" (R. 201). Dr. Chisholm found, on December 16, 2008, that Plaintiff had a groin strain, not a hernia, and he should continue receiving care with his pain management physician (R.

16, 438). The ALJ accommodated the limitation found by Dr. Chisholm by reducing Plaintiff's residual functional capacity to sedentary.

As previously noted, Dr. Bess was Plaintiff's treating physician and Dr. Sagin treated Plaintiff for sleep apnea. Their opinions as to Plaintiff's conditions and limitations qualify as medical opinions. Plaintiff asserts that the "third requirement," as mandated by SSR 96-2p, "is that the adjudicator must find that the treating sources medical opinion is well supported by medically acceptable clinical and laboratory diagnosis and techniques. References are again made to the reports of the several different medical physicians and treatment facilities that have treated the Plaintiff over the course of these past years, which clearly demonstrates specific clinical findings as to the source and cause of the Plaintiff's back problems, pulmonary problems, breathing problems, and complaints of pain as well as his physical limitations and restrictions" (Plaintiff's brief at p. 7). Plaintiff further argues that "the record shows that the claimant has been unable to receive the proper medical care all of his treating physicians have recommended because of insurance/money issues. In effect, the claimant is being penalized because of non-access to proper medical care" (Plaintiff's brief at pp. 7,8).

First, as noted in the preceding paragraph, Plaintiff did not identify, in the record of evidence, the "reports of the several different medical physicians and treatment facilities that have treated the Plaintiff . . . which clearly demonstrates specific clinical findings as to the source and cause of the Plaintiff's back problems, pulmonary problems, breathing problems, and complaints of pain as well as his physical limitations and restrictions" that support the opinions of Drs. Bess and Sagin[1].

---

[1]Local Rule of Civil Procedure 9.02 (g), mandates the following: "<u>References to the Administrative Record</u>: Claims or contentions by the plaintiff alleging deficiencies in the Administrative Law Judge's (ALJ) consideration of claims or alleging mistaken conclusions of

Second, the record does not contain one example of Plaintiff not seeking or receiving medical care due to his lack of monetary resources. Plaintiff was treated by Dr. Bess, Dr. Chisholm, and Dr. Sagin on numerous occasions over a span of several years. Additionally, he sought psychiatric care from Dr. Rajan. He underwent a consultative examination by Dr. Mir. He was treated by a pain specialist. He had been evaluated for gastric bypass, a procedure that was delayed not because of Plaintiff's financial restraints, but because of his "breathing" condition (R. 409). Plaintiff adhered to his prescribed medication regimen without once commenting to any prescribing physician that he could not afford to pay for medication. Plaintiff underwent a MRI, an echocardiogram, a cardiolite stress test, a duplex venous Doppler test, an overnight sleep study, pulmonary function test, and a CPAP study. Plaintiff frequently participated in physical therapy as ordered by Dr. Bess.

Although the ALJ, in his decision, thoroughly evaluated and considered the opinions of Drs. Bess and Sagin, he did not assign controlling weight to Drs. Bess and Sagin because, although both of these physicians noted, in their medical records, the results of their examinations and treatments of Plaintiff and the progress made by Plaintiff, neither doctor offered an opinion that Plaintiff experienced any exertional or non-exertional limitations.

The ALJ noted the following medical information that was provided by Dr. Bess:

In April of 2007, the claimant began treatment with primary care physician Dr. Bess for lower back pain and spasm (Exhibit 19F, page 60). An examination revealed a full range of extremity motion, a stable gait, and no evidence of psychological or neurological abnormalities. Dr. Bess recommended that the claimant lose weight and

fact or law and contentions . . . **must include a specific reference, by page number, to the portion of the record** that (1) recites the ALJ's consideration or conclusion and (2) supports the party's claims, contentions or arguments." (Emphasis added.) In his Memorandum in Support of Motion for Summary Judgment, Plaintiff failed to reference any page number within the administrative record that supported his allegations or name specific evidence which supported his argument.

increase his exercise. He was referred to . . . Progressive Physical Therapy and Sports" (R. 16). . . . On May 29, 2007, Mr. Watson told Dr. Bess that his symptoms have improved considerably (Exhibit 19F, page 56). . . . Dr. Bess offered an injection of pain relieving medication, but considered the claimant to be stable and doing well (Exhibit 19F, page 50) (R. 16). . . . On June 23, 2009, the claimant was seen by Dr. Bess . . . . A subsequent examination revealed a full range of motion, no evidence of joint swelling or tenderness, a stable gait, no evidence of cyanosis, clubbing or edema, and no evidence of psychological or neurological abnormalities (Exhibit 21F, page 5) (R. 17).

The medical records of Dr. Bess and Physician Assistant Woy contain their diagnoses of degeneration of the lumbar disks with no stenosis or herniation and degenerative joint disease of Plaintiff's right shoulder, knee, ankles and hands in every record of each office visit. These records also contain information that Plaintiff was uniformly stable and lacked limitations. P.A. Woy found, during several examinations of Plaintiff, that he was stable and doing well (R. 17, 374, 380, 382, 384, 386, 388). The medical records contain numerous notations that Plaintiff was not in any acute distress and his examinations were normal (R. 17, 373, 375, 377, 379, 381, 383, 385, 387). Dr. Bess repeatedly found that Plaintiff could maintain "relatively normal activity" (R. 345, 398, 419). Throughout his treatment of Plaintiff, Dr. Bess also instructed Plaintiff to "get regular exercise," such as a "brisk walk for 20-30" minutes and to diet (R. 376, 378, 380, 382, 384, 386, 388, 391, 393, 395, 397, 399). On December 2, 2008, Dr. Bess instructed Plaintiff to engage in "an exercise program that [got] heart rate up for 20-30 minutes several times a week" (R. 418). The findings discussed by the ALJ and contained in the record were a recitation of Plaintiff's conditions and did not even suggest any functional limitation; the records of Dr. Bess revealed that he encouraged Plaintiff to be active.

The findings of Dr. Bess were supported by clinical and laboratory diagnostic techniques and consistent with the substantial evidence in the case record. Plaintiff's July 25, 2007, MRI showed

degenerative lumbar disk disease, mild degenerative lumbar arthritis but no spinal stenosis, disk herniation or nerve root compression. Plaintiff's November 25, 2008, duplex venous Doppler examination of his lower extremities was normal. (R. 16, 17, 18, 213, 366, 439). Plaintiff reported to Dr. Bess, on February 3, 2009, that his sacroiliac joint was "much better" (R. 413). Dr. Mir found no weakness, no claudication, no paresthesias, intact strength, no sensory deficits, negative straight leg raising test, no lumbar flexion or extension limitations, no lumbar paraspinal tenderness, no sacroiliac joint tenderness, and no foraminal narrowing of lumbar spine. Dr Mir opined that Plaintiff had mild degenerative disk disease and mild degenerative arthritis of the lower lumbar spine and was physically deconditioned, should lose weight, and should continue with physical therapy (R. 16-17, 234-36). On December 9, 2008, Dr. Arnold found Plaintiff had no pain to palpation in his lumbar area. His strength was 5/5 in his lower extremities and his straight leg raising test was negative, bilaterally (R 443). Dr. Wiedower found, on April 24, 2009, that Plaintiff's musculoskeletal examination produced "grossly normal" ranges of motion (R. 432-33). Dr. Chisholm's findings support the findings of Dr. Bess; he found Plaintiff to be in no acute distress and his examination of Plaintiff was normal (R. 16, 208). The ALJ's findings as to Dr. Bess are supported by the evidence of record.

The ALJ noted the following medical information provided by Dr. Sagin:

A December 2007 sleep study chronicled Mr. Watson's severe obstructive sleep apnea when positioned in supine with CPAP ineffective in this position (Exhibit 8F). . . . However, treatment for these conditions has been conservative and routine, with no evidence of a serious complication requiring emergency treatment (R. 17, 18).

In addition to the above discussion by the ALJ, the record contains additional information of Dr. Sagin's treatment of Plaintiff. As noted above, on December 7, 2007, Dr. Sagin found that

Plaintiff did have severe obstructive sleep apnea when in the supine position, but "on his side at 17cm H2O pressure despite some continued snoring most of his obstructive events were eliminated with the presence of sustained sleep" (R. 261, 309, 311-15, 357-62). On January 29, 2008, Plaintiff's wife reported that Plaintiff's snoring had been eliminated. Dr. Sagin found Plaintiff's compliance was seven (7) hours and sixteen (16) minutes and instructed Plaintiff to sleep on his side because his apnea "would be adequately controlled on his side" (R. 324). On March 18, 2008, Plaintiff reported he slept on his side "most of the time." Dr. Sagin found that the "data from [Plaintiff's] CPAP machine suggest effectiveness at his current pressure setting when on his side." Plaintiff was instructed to medicate with Modafinil because he had had a positive response to it (R. 325-26, 353). On July 7, 2008, Plaintiff reported he slept in the prone position and not on his side. Dr. Sagin diagnosed moderately severe obstructive sleep apnea "when supine." Plaintiff's wife reported he did not snore when he wore his mask (R. 354). On February 19, 2009, Dr. Sagin found Plaintiff "[felt] better than before the started on CPAP." His compliance was one-hundred (100) percent. Plaintiff's wife reported he snored occasionally (R. 442). The findings of Dr. Sagin show reduced or eliminated symptoms of obstructive sleep apnea when Plaintiff complied with his instruction to sleep on his side and use his CPAP machine; however, they do not contain any opinion as to functional limitation.

The findings of Dr. Sagin were consistent with the substantial evidence in the case record. Plaintiff informed Dr. Bess, on September 30, 2008, that his fatigue was stable (R. 343). On October 15, 2008, Dr. Bess found Plaintiff's obstructive sleep apnea was stable (R. 340). On December 2, 2008, Plaintiff reported to Dr. Bess that he had "much improved sleep with cpap" (R. 417). Dr. Wiedower found Plaintiff's obstructive sleep apnea was stable on April 24, 2009 (R. 433). On April

28, 2009, Dr. Bess found the "severity of [Plaintiff's] chronic illnesses ha[d] otherwise remained stable" (R. 411).

The undersigned finds the ALJ did not err in his decision as to the opinion of Dr. Chisholm and the findings of Dr. Bess and Dr. Sagin, and his opinion is supported by substantial evidence.

## D. Credibility

Plaintiff asserts the ALJ did not undertake the credibility analysis as mandated in *Craig v. Chater*, 76 F.3d, 585 (4th Cir. 1996), and 20 C.F.R. 1529.[2] Plaintiff argues that the ALJ "should evaluate the intensity and persistence of the pain and the extent of the limitations on the Plaintiff's ability to work," as mandated by the Fourth Circuit in *Craig*, supra, at 595 (Plaintiff's brief at pp. 8-9). The Defendant asserts the ALJ properly found that Plaintiff's subjective complaints were not entirely credible.

In *Craig*, supra at 594, the Fourth Circuit mandated the following protocol relative to the consideration and analysis of an individual's complaints of pain:

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .
>
> 2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it*

_____

[2]Again, it must be noted that Plaintiff failed to adhere to L.R.Civ.P. 9.02 (g) and provide references to the record that support his assertion that the ALJ failed to properly analyze his complaints of pain.

*affects her ability to work, must be evaluated*, See 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

The ALJ in the instant case made the following finding: ". . . After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . ." (R. 15). The undersigned finds the ALJ fully complied with the first threshold step in *Craig*, id.; therefore, the ALJ was required to evaluate Plaintiff's complaints of pain in conformance with step two. In conducting step two of the analysis, the ALJ found the following:

> . . . [T]he claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extend they are inconsistent with the above residual functional capacity assessment (R. 16). . . . [D]espite all of the claimant's alleged impairments, Mr. Watson continues to take care of some personal needs, prepare light meals, straighten up around the house, wash laundry, mow the lawn with a tractor, drive, shop for groceries, use a computer for 30-45 minutes at a time and attend church once a week, albeit at a slower pace and with assistance from his family (Exhibit 5E, page 2-5). The claimant's statements regarding the severity of his limitations are not credible to the extend they are inconsistent with the residual functional capacity, because they are not supported by the medical evidence of record (R. 18).

20 C.F.R. 404.1529 specifically lists the following criteria, as does *Craig*, id., that must be considered by the ALJ in assessing Plaintiff's credibility:

> In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. By objective medical evidence we mean medical signs and laboratory findings as defined in

41

§404.1528(b) and (c). By other evidence, we mean the kinds of evidence described in §§404.1512(b)(2) through (6) and 404.1513(b)(1), (4), and (5) and (e). These include statements or reports from your treating or examining physician or psychologist, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work. We will consider all of your statements about your symptoms, such as pain, and any description you, your physician, your psychologist, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work. However, statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or the symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled.

Additionally, SSR 96-7p mandates, in part, the following:

It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

A review of the ALJ's decision finds he complied with the mandates contained in the credibility analysis of *Craig*, supra, and the criteria listed in 20 C.F.R. 404.1529. Specifically, the ALJ considered and evaluated the objective medical evidence of record and Plaintiff's medical history, laboratory findings, objective medical evidence of pain, activities of daily living, medical treatment used to alleviate pain, and Plaintiff's statements. His decision thereon is supported by the evidence of record. Additionally, the ALJ's decision contained "specific reasons for the finding on credibility," as required in SSR 96-7p.

The ALJ considered Plaintiff's medical history pertaining to obesity, affective disorder with anxiety and depression, obstructive sleep apnea, mild degenerative disc disease, degenerative joint disease, hernia repair, and chronic obstructive pulmonary disease. The ALJ evaluated Plaintiff's treatment history with Dr. Bess, Dr. Rajan, Dr. Sagin, Dr. Chisholm and various physical therapists, including the medical tests ordered and interpreted by these physicians (R. 11-18).

The ALJ considered the laboratory findings as to Plaintiff's conditions; these laboratory findings support the ALJ's opinion as to Plaintiff's allegations of pain. The ALJ assessed Plaintiff's July 25, 2007, MRI, which showed degenerative lumbar disk disease, mild degenerative lumbar arthritis but no spinal stenosis, disk herniation or nerve root compression. The ALJ considered Plaintiff's November 25, 2008, duplex venous Doppler examination of his lower extremities, which was normal. (R. 16, 17, 18, 213, 366, 439). The ALJ considered Plaintiff's pulmonary function test, which showed "moderate reduction in forced expired volume with a severe function in the FEV1" (R. 17, 406). The ALJ considered the November 2, 2007, "cardiac diagnostic testing," which showed "trace tricuspid and mitrial regurgitation, normal left ventricle systolic function, and a left ventricular ejection fraction of 50 to 55%, and no evidence of acute abnormalities" (R. 12, 255). Additionally, Plaintiff's August 8, 2008, echocardiogram showed the following: no significant pericardial effusion; mild left ventricular hypertrophy without any evidence of focal wall motion abnormality and an ejection fraction of fifty-five (55) to sixty (60) percent; no significant valvular regurgitation or stenosis; no significant chamber dilatation; and aortic root ectasia measuring four (4) cm (R. 351). The ALJ also evaluated the results of Plaintiff's sleep study, which showed Plaintiff's obstructive sleep apnea (R. 17, 261, 309, 311-15, 357-62).

The ALJ considered the medical treatment prescribed for and used by Plaintiff to alleviate

43

his pain. The ALJ considered the physical therapy in which Plaintiff participated in to relieve his symptoms (R. 16, 17). As late as February, 2009, Plaintiff reported to Dr. Bess that he was having "success" with physical therapy (R. 413). The ALJ assessed Plaintiff's treatment of obstructive sleep apnea with medication and CPAP machine (R. 17). He noted Plaintiff's treatment was conservative for this condition and he had not received any emergent care (R. 18). The ALJ considered the injections Plaintiff received in his shoulder for relief of pain (R. 17). The Plaintiff told Dr. Bess that he received relief from the shoulder injection (R. 345). On September 30, 2008, Plaintiff told Dr. Bess that he had no adverse side effects caused by his medication (R. (R. 343). Plaintiff informed Dr. Chisholm on August 4, 2006, that he did not treat his right groin pain with "any anti-inflammatories, heat or ice as he just [did] not think about it much" (R. 201). The ALJ noted Plaintiff continue to medicate his groin pain with Lyrica (R. 17). Plaintiff testified that the medication he took for depression "helped . . . some" (R. 44).

Plaintiff contends that the ALJ's conclusion that Plaintiff's statements of pain were not consistent with the objective or clinical findings "discounts the ongoing and consistent active medical treatment" Plaintiff received and is based on his "analysis of the multitudinous medical records that the Claimant's neurological examinations were normal" (Plaintiff's brief at pp. 9-10). The ALJ reviewed and evaluated the objective medical evidence of record, not just the findings that Plaintiff's neurologic examinations were normal, and Plaintiff's statements of pain in determining Plaintiff's statements were inconsistent with the record of evidence.

The ALJ noted the following in his decision:

In his testimony and statements prepared for the record, the claimant asserts that he is disabled and unable to work due to depression, sleep apnea, restless leg syndrome, obesity, lower back and groin pain, pain, hernia complications, chronic fatigue,

severely restricted lung function, and the resulting impairment symptoms (Exhibit 2E, page 2). . . . As a result of his degenerative disc disease, hernia, lack of knee cartilage, and severe arthritis in his neck and shoulder, Mr. Watson claims that he suffers from severe pain in his lower back, groin and bilateral knees. The knee pain is normally 3 to 4 on a severity scale of 1 to 10. It is exacerbated by exertional activity and changes in the weather. The claimant testified that he can sit for one-half of one hour, stand for no more than 10-15 minutes at a time, lift a gallon of milk, and walk for 50 feet before he is out of breath. Mr. Watson alleges that his shoulder arthritis prevents him from reaching overhead with his dominant right shoulder. . . . In addition to his chronic pain, the claimant described limitations from his lung and mental impairments. Mr. Watson testified that he uses a continuous positive airway pressure machine (CPAP) to alleviate the symptoms of obstructive sleep apnea and sleep for 12 hours per night. The claimant alleges that he no longer smokes. As a result of his mental impairment and the limitations from his physical impairments, Mr. Watson experiences anger, depression, crying spells every 2-3 weeks, has previously harbored suicidal thoughts, and has difficulty with concentration and memory. The claimant testified that he can not pay attention the way he used to and has difficulty following conversations with others. He is angered and agitated by others easily and does not enjoy being with friends anymore (Exhibit 5E, page 6). . . . (R. 15).

In determining that Plaintiff's statements about the intensity, persistence and limiting effects of his symptoms were not credible, the ALJ considered the objective medical evidence and found Plaintiff's statements were inconsistent thereto. The ALJ considered the opinion of Dr. Chisholm that "it would be helpful if the claimant pursued work activity that did not involve so much strenuous lifting." The ALJ considered the April, 2007, record of Dr. Bess that showed, in addition to no neurological abnormalities, a full range of extremity motion, stable gait, and no psychological abnormalities. He instructed Plaintiff to lose weight and exercise to alleviate his pain. The ALJ noted that, in addition to Dr. Mir's finding no neurologic abnormalities on September 19, 2007, he found Plaintiff's physical deconditioning contributed to his pain (R. 16). Dr. Mir found Plaintiff's back pain did not radiate; he had no sensory deficits; he had a negative straight leg raising test; he had no lumbar flexion or extension limitation; there was no evidence of foraminal narrowing of his

lumbar spine; or there were no symptoms of lumbar radiculopathy (R. 16-17, 234-36). Dr. Chisholm found, on December 16, 2008, that Plaintiff's gait was normal and he was able to stand without difficulty. Dr. Chisholm found Plaintiff had a groin strain, not a hernia, and he should continue receiving pain management (R. 16, 438). On December 9, 2008, Dr. Arnold found Plaintiff's right groin sensation was intact and he had "minimal diffuse tenderness to palpation over his right groin area" (R. 443). The ALJ considered the April 24, 2009, opinion of Dr. Wiedower, who conducted a pre-operation examination of Plaintiff and found his musculoskeletal examination produced "grossly normal" ranges of motion (R. 17, 432-33). The ALJ noted Plaintiff could heel-to-toe walk and had no acute abnormalities in September, 2008. The ALJ considered the June, 2009, finding by Dr. Bess that Plaintiff had full ranges of motion, no evidence of joint swelling or tenderness, a stable gait, no evidence of cyanosis, clubbing, or edema, no psychological abnormalities as well as a normal neurologic examination. Dr. Bess opined Plaintiff was stable and doing well (R. 16-17). The ALJ supported his finding by evaluating the opinions of Dr. Sagin, who noted Plaintiff's sleep apnea was severe when in the supine position, but not while sleeping on his side, and he had received only conservative treatment for this condition. The ALJ also supported his finding by evaluating Dr. Bess's June 23, 2009, opinion that Plaintiff's mood and affect were stable and congruent and he had no appreciable changes in judgment or reasoning (R. 18). Plaintiff informed Dr. Bess, on January 6, 2009, that his depression was stable; Dr. Bess opined Plaintiff's psychiatric examination was "stable" on January 6, April 28, and June 23, 2009 (R. 409, 411, 415).

Finally, the ALJ evaluated Plaintiff's activities of daily living as they relate to his statements about pain. The ALJ noted the following:

As a result of his impairments, the claimant contends that his functional capabilities

are severely limited. Mr. Watson continues to live with his wife and three adult children. In his statements prepared for the record, the claimant described how he continues to take care of some personal needs, prepare light meals, straighten up around the house, wash laundry, mow the law with a tractor, drive, shop for groceries, and attend church once a week, albeit at a slower pace and with assistance from his family. (Exhibit 5E, page 2-5 [December 13, 2007 Function Report]). At the hearing, Mr. Watson testified that his wife pays bills, takes care of household chores, and completes the yard work. He further testified that getting dressed takes longer and he has trouble with the steps in his ranch house. He has difficulty bending from the waste but can bend and pick up clothing from the floor. Mr. Watson's hobbies include playing cards, watching television, and using the computer for 30-45 minutes at a time (Exhibit 5E, pages 5-6 [December 13, 2007, Function Report]). Most of the time, the claimant is limited to light household activities and resting to relieve the symptoms of his impairments (R. 15).

The ALJ considered these activities of daily living with the entire record of evidence in determining Plaintiff was not entirely credible. The ALJ noted that Plaintiff installed a kitchen floor in May, 2007 (R. 16). Plaintiff also cared for his mother, moved a refrigerator, moved a freezer and performed repairs on three cars during that month (R. 220-21). Further, and as evaluated by the ALJ, Plaintiff was not instructed to limit his activities of daily living by his treating physician. Dr. Bess repeatedly instructed Plaintiff to exercise by walking briskly for twenty-to-thirty (20-30) minutes (R. 16, 19). Additionally, Dr. Bess opined that Plaintiff had "relatively normal activity" and no changes in his level of activity on April 13, 2007, and August 5, 2008 (R. 346, 398). The ALJ considered the opinions of Dr. Rajan, who did not, on neither January 14, 2007, nor November 12, 2008, make a finding as to Plaintiff's activities of daily living (R. 17-18). Plaintiff testified that he received visitors two-to-three (2-3) times per week (R. 37). The ALJ also considered the evidence that Plaintiff went deer hunting on November 25, 2008 (R. 17).

"Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight."

*Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

The ALJ properly considered and weighed all relevant evidence in forming his opinion regarding Plaintiff's credibility. The undersigned finds substantial evidence supports the ALJ's determination that Plaintiff was not entirely credible.

### E. Listing 1.02 and 1.04

Plaintiff's total argument that the ALJ erred in not finding Plaintiff met or equaled a listing is as follows:

> The [ALJ] further concluded that the Claimant did not have an impairment or a combination of impairments that met or equaled listing governing the muscular skeletal disorders particularly sections 1.02 and 1.04 (R. 18). The [ALJ] did not fairly and adequately consider whether or not those listings were met based on the medical evidence of record nor did she (sic) consider the possibility of whether or not the Plaintiff's condition was the medical equivalent of the listing of impairments as noted in 20 CFR 404.1526 (Plaintiff's brief at p. 10).

As evident above, Plaintiff failed to adhere to L.R.Civ.P. 9.02 (g) and provide references to the record that support his assertion that the ALJ erred in finding he did not meet or equal a listing. The ALJ, however, conducted an exhausted evaluation of Plaintiff's impairments as they related to the listings. He found the following:

> The claimant's obesity does not fall within the criteria of a listed impairment. However, pursuant to Social Security Ruling 02-1p, it must be considered in conjunction with other related conditions. The claimant's obesity, degenerative disc disease, degenerative joint disease, breathing abnormality , and obstructive sleep apnea do not meet any physical listing of appendix 1. The claimant's degenerative joint disease fails to meet the criteria of section 1.02 in that he does not have a major dysfunction of his knees characterized by gross anatomical deformity and chronic joint pain and stiffness with sight of limitation of motion or other abnormal motion of the affects (sic) joints. He does not have findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction or ankylosis of the affects (sic) joints. There is no involvement of one major peripheral weight-bearing joint resulting in an inability to ambulate effectively, as defined in 1.00B2b. Furthermore, there is not involvement of one major peripheral joint in each upper

extremity resulting in an inability to perform fine and gross movements effectively, as defined in 1.00B2c. There is no evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication and an inability to ambulate effectively so as to meet any provision of section 1.04.

The claimant's history of hernia repair does not meet any musculoskeletal or digestive listing in sections 1.00 and 5.00. The claimant's chronic obstructive pulmonary disease has not resulted in reduced forced expiratory volumes (FEV) and/or forced vital capacity (FVC) equal to or less than those specified in Table I or II of section 3.02, and thus fails to meet the criteria of that section. Obstructive sleep apnea is evaluated under section 3.09. Section 3.09 requires clinical evidence of cor pulmonale with mean pulmonary artery pressure greater than 40 mm Hg; or aterial hypoxemia meeting the requirements of section 3.02. The claimant's records fail to document the required severity. Nor does the record reflect an impairment or combination of impairments imposing such functional limitations so as to be medically equivalent in severity to any section of Appendix 1 (R. 12).

In addition to the above, the ALJ completed a comprehensive evaluation of Plaintiff's mental impairments as they relate to Listings 12.04 and 12.06 (R. 12-13).

As noted by the ALJ, Plaintiff met neither Listing 1.02 nor 1.04. Although Plaintiff had been diagnosed with degenerative joint disease of his right shoulder and knees, the medical evidence, which was reviewed and evaluated by the ALJ, supported his finding that Plaintiff failed to meet Listing 1.02. To qualify for a disability designation under Listing 1.02, Plaintiff must provide evidence of the following:

1.20 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

OR

B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

Plaintiff did not meet the criteria. From April 13, 2007, through June 23, 2009, Dr. Bess or Physician Assistant Woy examined and treated Plaintiff for knee and shoulder pain. As to Plaintiff's knee, their examinations resulted in a finding of no joint swelling or tenderness, full ranges of motion, and stable gait. Plaintiff was constantly encouraged by Dr. Bess and P.A. Woy to participate in regular exercise, such a taking a "brisk walk for 20-30" minutes. On July 27, 2007, P.A. Woy found Plaintiff was stable and was "doing well."(R. 16, 17, 341, 343-44, 345-46, 373-74, 375-76, 377-78, 379-80, 381-82, 385-86, 390-91, 394-95, 396-97, 398-99, 409-10, 411-12, 414-15, 417-18, 419-20, 421-22). Dr. Mir found, on September 19, 2007, that Plaintiff's strength was intact in his lower extremities; he had no sensory deficit (R. 16, 234-35). Dr. Chisholm found, on December 16, 2008, that Plaintiff's gait was normal and he was able to stand without difficulty (R. 16, 438). There is no finding by any of these doctors that Plaintiff had difficulty ambulating. There was no imaging test results in the record of evidence to show any impairment of the knee that would support a finding that his knee impairment met a listing.

Plaintiff's shoulder pain was treated on August 8, 2007, with a joint injection. Plaintiff informed Dr. Bess that he realized "good improvement" to his pain from the injection (R. 392-93). Plaintiff received a second injection on August 5, 2008. Dr. Bess noted Plaintiff's activity was "relatively normal" and had not changed. Plaintiff informed Dr. Bess that he realized "good improvement" to his pain from that injection (R. 16, 17, 345). On January 15, 2008, Dr. Franyutti found Plaintiff had no manipulative limitations (R. 18, 273). Dr. Cindy Osborne confirmed Dr. Franyutti's findings on May 27, 2008 (R. 18, 331). Dr. Mir found, on September 19, 2007, that

Plaintiff's strength was intact in his upper extremities; he had no sensory deficit (R. 16-17, 235).

Plaintiff testified at the administrative hearing that he could not reach overhead "very good" (R. 47).

He stated he did not have any limitations gripping and grasping (R. 48). There was no imaging test

in the record of evidence to show any impairment of the right shoulder that would support a finding

that Plaintiff's shoulder impairment met a listing.

Although Plaintiff had been diagnosed with degenerative lumbar disk disease and mild

lumbar arthritis, the medical evidence, which was reviewed and evaluated by the ALJ, supported his

finding that Plaintiff failed to meet Listing 1.04. To qualify for a disability designation under Listing

1.04, Plaintiff must prove evidence of the following:

> 1.04 *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> OR
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
>
> OR
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

Plaintiff was diagnosed with none of the conditions listed above. Plaintiff's July 25, 2007, MRI showed degenerative disc disease, with mild bulging at L4-L5 and L5-S1, but no disk herniation or nerve root impingement. The MRI also showed mild degenerative arthritis of Plaintiff's lower lumbar facet joints; however, no spinal stenosis was found (R. 213, 366). This conclusive medical test was evaluated and considered by the ALJ and is sufficient to support the ALJ's finding that Plaintiff did not meet Listing 1.04. Nonetheless, the record is ripe with findings by Plaintiff's treating and examining physicians to support the ALJ's decision. Dr. Bess, throughout the two-plus years he treated Plaintiff, diagnosed degeneration of lumbar discs, with no herniation or stenosis. He constantly noted Plaintiff had full ranges of motion and his gait was normal. Dr. Bess found Plaintiff to be neurologically intact. On February 3, 2009, Plaintiff told Dr. Bess that his sacroiliac joint was "much better" and his physical therapy was a success (R. 16, 17, 341, 343-44, 345-46, 373-74, 375-76, 377-78, 379-80, 381-82, 385-86, 390-91, 394-95, 396-97, 398-99, 409-10, 411-12, 414-15, 417-18, 419-20, 421-22).

Dr. Mir found Plaintiff's back pain did not radiate; he had no sensory deficits; he had a negative straight leg raising test; he had no lumbar flexion or extension limitation; there was no evidence of foraminal narrowing of his lumbar spine; and there were no symptoms of lumbar radiculopathy (R. 16-17, 234-36). On December 9, 2008, Dr. Arnold found Plaintiff had no pain to palpation in his lumbar region. His strength was 5/5 in his lower extremities. Plaintiff's straight leg raising test was negative, bilaterally. Dr. Chisholm found, on December 16, 2008, that Plaintiff's gait was normal and he was able to stand without difficulty (R. 16, 438). On April 24, 2009, Dr. Wiedower, who conducted a pre-operation examination of Plaintiff, found his musculoskeletal examination produced "grossly normal' ranges of motion (R. 17, 432-33). None of the doctors who

treated or evaluated Plaintiff found he had difficulty ambulating. Plaintiff testified he did not walk

with a cane (R. 35).

Finally, the ALJ did not err in his determination that Plaintiff's combination of impairments

was not medically equivalent to a listing. 20 CFR 404.1526 holds

> (a) *What is medical equivalence?* Your impairment(s) is medically equivalent to a
> listed impairment in appendix 1 if it is at least equal in severity and duration to the
> criteria of any listed impairment.
>
> (b) *How do we determine medical equivalence?* We can find medical equivalence in
> three ways.
>
>> (1)(I) If you have an impairment that is described in appendix 1, but
>> (A) You do not exhibit one or more of the findings specified in the
>> particular listing, or
>> (B) You exhibit all of the findings, but one or more of the findings is
>> not as severe as specified in the particular listing,
>> (ii) We will find that your impairment is medically equivalent to that
>> listing if you have other findings related to your impairment that are
>> at least of equal medical significance to the required criteria.
>>                         . . .
> (c) *What evidence do we consider when we determine if your impairment(s)
> medically equals a listing?* When we determine if your impairment medically equals
> a listing, we consider all evidence in your case record about your impairment(s) and
> its effects on you that is relevant to this finding. We do not consider your vocational
> factors of age, education, and work experience (see, for example, §404.1560(c)(1)).
> We also consider the opinion given by one or more medical or psychological
> consultants designated by the Commissioner. (See §404.1616.)
>                         . . .

Plaintiff had none of the findings specified in either Listing 1.02 or Listing 1.04. Most notably,

Plaintiff had no other findings that were related to his impairment that were at least of equal medical

significance to the required criteria in Listings 1.02 and 1.04. As noted above, the ALJ conducted

a thorough analysis of all impairments that he found to be severe, including obesity, in determining

if those impairments, particularly in combination, equaled a listing. Further, the ALJ found, despite

Plaintiff's severe impairments, he retained the functional capacity to perform sedentary work;

ambulate effectively; perform gross movements; occasionally stoop and bend; and perform unskilled work that required minimal interaction with the public (R. 12-14). His finding is supported by the above noted evidence. Additionally, the United States Supreme Court, in *Sullivan v. Zebley*, 493 U.S. 521, 531, 110 S.Ct.885, 892 (1990), has held:

> A claimant cannot qualify for benefits under the "equivalence" step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment. SSR 83-19, at 91-92 ("[I]t is incorrect to consider whether the listing is equaled on the basis of an assessment of *overall* functional impairment. . . . The functional consequences of the impairments . . . irrespective of their nature or extent, *cannot* justify a determination of equivalence") (emphases in original).
>
>> FN11. For example, if a child has both a growth impairment slightly less severe than required by listing § 100.03, and is mentally retarded but has an IQ just above the cut-off level set by § 112.04, he cannot qualify for benefits under the "equivalence" analysis-no matter how devastating the combined impact of mental retardation and impaired physical growth.

Upon consideration of all of the above, the undersigned finds substantial evidence supports the ALJ's finding that Plaintiff did not meet Listings 1.02 or 1.04.

## V. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's applications for DIB is supported by substantial evidence. I accordingly recommend the Defendant's Motion for Summary Judgment be **GRANTED,** and the Plaintiff's Motion for Summary Judgment be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy

of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this **2 2** day of July , 2011.


JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE